# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 6, 2023

Lyle W. Cayce
Clerk

————————

No. 22-50405

————————

Rex Real Estate I, L.P.,

*Plaintiff—Appellant,*

*versus*

Rex Real Estate Exchange, Incorporated,

*Defendant—Appellee.*

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-696

———————————————————

Before Richman, *Chief Judge*, and Haynes and Graves, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:

Plaintiff Rex Real Estate I, L.P. sued Defendant Rex Real Estate Exchange for trademark infringement. The district court granted Defendant's motion for judgment as a matter of law after Plaintiff rested its case, and Plaintiff now appeals. A reasonable jury could not find in favor of Plaintiff's Section 32(1) claim, but it could find in favor of Plaintiff's Section 43(a) claim. Therefore, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

# I. Background

## a. Factual Background

Plaintiff is a real estate company founded by Rex and Sherese Glendenning that "specializes in the acquisition and sale of commercial, investment and development properties, both large and small, in the North Texas growth corridor." Plaintiff only brokers real estate in the state of Texas, but it has clients throughout the United States and in other countries.

Mr. and Mrs. Glendenning first entered the Texas real estate business in 1987. In February 1987, Mr. Glendenning registered a sole proprietorship called "Rex Glendenning Real Estate." Around this time, Mrs. Glendenning thought their last name was too long and began answering the business's phone as "Rex Real Estate." On July 10, 1990, Mr. Glendenning registered another sole proprietorship called "Rex Real Estate." On September 16, 1991, the Glendennings incorporated Rex Real Estate Inc., naming themselves as the two members of the Board of Directors. Finally, in December 1998, the Glendennings filed a limited partnership agreement forming Rex Real Estate I, L.P., the Plaintiff in this case. Rex Real Estate, Inc. was named as a general partner with a two percent ownership interest, and Mr. and Mrs. Glendenning were each named as limited partners with forty-nine percent ownership interests.

Plaintiff has used three trademarks throughout its existence: "REX," "REX Real Estate," and a logo showing a crown alongside the words "REX Real Estate" ("crown mark"). On January 13, 2015, the U.S. Patent and Trademark Office ("USPTO") accepted Plaintiff's registration of the crown mark. According to Plaintiff's submission, the mark's first use in commerce was January 1, 1987. Plaintiff filed a federal trademark registration for the "REX" mark in June 2018, claiming its first use in commerce was December 31, 1987. Finally, it filed a federal trademark registration for the

"Rex Real Estate" mark without the crown in June 2018, claiming its first use in commerce was December 31, 1990.

According to its website, Plaintiff has developed "a diverse portfolio of retail, office, industrial and mixed-used properties throughout Texas, [and] REX Real Estate and founder Rex Glendenning have closed hundreds of millions of dollars in investment transactions for private and institutional investors." Plaintiff has also brokered some residential real estate. At trial, Mrs. Glendenning identified two instances where the business sold single family homes. One of those homes was sold to the Glendennings' daughter and son-in-law, Matthew Kiran, who is also a long-time sales agent for Plaintiff. Plaintiff's residential listings from 2009 to 2022 include three properties identified as single-family residences sold to individual buyers and six properties identified as residences with acreage sold to individual buyers. Three of these sales involved parties related to Plaintiff or its employees: one was the sale of Mrs. Glendenning's parents' home, one was a sale to Kiran's son, and the other was the aforementioned sale to the Glendennings' daughter and Kiran. The vast majority of Plaintiff's "residential" listings from 2009 to 2022 were investment properties sold to corporate entities. These transactions averaged over 238 acres and over $6 million per sale.

Defendant Rex Exchange offers an online platform for homeowners and homebuyers to transact the sale of single-family homes. It uses artificial intelligence and other data-based technology to match likely buyers with homes. It started in 2015 in California, and it is now headquartered in Austin, Texas. Its business is designed to "help home buyers and sellers avoid excessive costs associated with the traditional real estate agent-based model." It operates in twenty-five cities in fifteen states, and it first expanded into Austin in 2018. Defendant's historical average sales price of a home in Texas is approximately $365,000, and the average lot size is 0.38 acres.

No. 22-50405

Defendant's CEO, Jack Ryan, testified that he came up with the name Rex Exchange in 2012 or 2013 to "mimic" the idea of the New York Stock Exchange but make it residential. He first learned of Plaintiff along with other companies named Rex when his company's lawyer performed a search with the USPTO in June 2014. Defendant's first website domain name was Rexchange—"R" for residential real estate and "ex" for exchange. In September 2014, Defendant purchased a "REX" trademark from a company called Azavea that had registered the mark for the following use: "computer software for use in search and displaying real estate information on a global computer network." Azavea's mark was registered with the USPTO in 2006 with an October 31, 2002 priority date.

In Texas, Defendant advertised in print and radio advertisements under the name "Rex." It promoted its expansion into Dallas using the names "Rex" and "REX Real Estate," and it has used a logo with the words "REX Real Estate" on its website and promotional materials.

### b. Procedural Background

Plaintiff sued Defendant for trademark infringement, trademark dilution, and unfair competition under federal and state law. After engaging in discovery, the parties cross-moved for summary judgment. The magistrate judge issued a report recommending that the district court deny both motions. The magistrate judge noted there were still genuine disputes of material fact as to: (1) whether Plaintiff's marks have acquired secondary meaning, (2) whether consumer confusion was probable, and (3) whether Defendant holds priority of use through the Rex mark it acquired from Azavea. Both parties filed objections, but the district court adopted the report in full.

The jury trial commenced on April 8, 2022. At trial, Plaintiff only pressed its trademark infringement claims. It called seven witnesses: (1)

No. 22-50405

Sherese Glendenning; (2) Matthew Kiran; (3) Jack Ryan; (4) Robert Cheetham (by deposition); (5) Danielle Gervasi; (6) Rex Glendenning; and (7) Jeffery Stec. The district court admitted 521 exhibits into evidence.

When Plaintiff rested its case on April 12, 2022, Defendant orally moved for judgment as a matter of law. Defendant argued that Plaintiff failed to meet its burden in three ways: (1) proof of legally protectable trademark rights; (2) proof of a likelihood of confusion caused by Defendant's use of its "Rex" trademarks; and (3) proof of actual damages attributable to the alleged infringement of Plaintiff's marks.

The following day, the district court orally granted Defendant's Rule 50 motion. The court then asked for supplemental briefing on the motion it had granted. After Plaintiff and Defendant submitted their supplemental briefs, the district court issued a written order granting the motion on May 18, 2022. It later entered final judgment in favor of Defendant, and Plaintiff timely appealed. Plaintiff only appeals the judgment against its federal infringement claims under the Lanham Act.

## II. Standard of Review

We review *de novo* a district court's grant of judgment as a matter of law, applying the same legal standard it used. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997). Judgment as a matter of law is proper when "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed. R. Civ. P. 50(a). In evaluating the district court's grant of judgment as a matter of law, we "consider all of the evidence (and not just that evidence which supports the non-mover's case) in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury." *Foreman*, 117 F.3d at 804. "A mere

scintilla of evidence is insufficient to present a question for the jury." *Id.* (citation omitted). We can affirm the district court if the result is correct, "even if our affirmance is upon grounds not relied upon by the district court." *Id.*

## III. Discussion

Plaintiff alleges trademark infringement in violation of Sections 32(1) and 43(a) of the Lanham Act, which are codified as 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), respectively. Section 32(1) creates a cause of action for infringement of registered marks; Section 43(a) creates a cause of action for infringement of unregistered marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 n.8 (5th Cir. 2010) ("The Lanham Act provides separate causes of action for infringement of a registered mark and an unregistered mark."). The same two elements apply to both causes of action. *Id.* To prevail on its claims, Plaintiff must show (1) it possesses a legally protectable trademark and (2) Defendant's use of this trademark "creates a likelihood of confusion as to source, affiliation, or sponsorship." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (citation omitted). Before addressing these two prongs, we begin with a threshold element: statutory standing.

### a. Statutory Standing

Defendant first argues we should affirm the district court's judgment because Plaintiff has failed to show that it owns the marks. Whether a plaintiff has a sufficient interest in a mark to sue under the Lanham Act is a question of statutory standing. "Unlike Article III standing, statutory standing is not jurisdictional. Instead, it asks the merits question of whether or not a particular cause of action authorizes an injured plaintiff to sue." *Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 666 (5th Cir. 2020) (citation and internal quotation marks omitted). We apply the same standard of review to statutory

No. 22-50405

standing as we do to the elements of the cause of action. *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 339 (5th Cir. 2021).

A claimant has "statutory standing" if its claim "fall[s] within the zone of interests protected by" the statute. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Section 32(1) protects registered trademarks and provides a cause of action against any person who "use[s] in commerce any . . . imitation of a registered mark . . . likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). This cause of action is only available to the "registrant" of the trademark at issue, but "registrant" is defined to include the original registrant's "legal representatives, predecessors, successors and assigns." *Id.* § 1127. Under the Lanham Act, the owner is the only proper party to apply for registration of a mark. *Id.* § 1051(a)(1) ("The owner of a trademark used in commerce may request registration of its trademark."). Therefore, only an owner or a true assignee has statutory standing to bring a claim under section 32(1). *Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 F. App'x 803, 806 (5th Cir. 2020)[1]; *accord Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013).

On the other hand, Section 43(a) protects unregistered trademarks and provides a cause of action to "any person who believes that he or she is likely to be damaged by such [infringing] act." *Id.* § 1125(a)(1).[2] Thus,

---

[1] Although an unpublished opinion issued on or after January 1, 1996 is generally not precedential, it may be considered as persuasive authority. *Ballard v. Burton*, 444 F.3d 391, 401 & n.7 (5th Cir. 2006).

[2] The Supreme Court has cautioned that not just *any* person can sue under Section 43(a). In a case that involved a false advertising claim under Section 43(a)(1)(B) [15 U.S.C. § 1125(a)(1)(B)], the Court held that a plaintiff must show the following to establish statutory standing: (1) it is within the "zone of interest" protected by the statute; and (2) proximate causation between its injury and the alleged statutory violation. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–33 (2014).

Section 43(a) does not require a plaintiff to establish ownership of a trademark as an element of its cause of action. *Belmora L.L.C. v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016) ("Significantly, the plain language of § 43(a) does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action."). Accordingly, Defendant's challenge to Plaintiff's ownership applies only to Plaintiff's infringement claim under Section 32(1).

"Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015); *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1264–65 (5th Cir. 1975) ("Ownership of a mark 'requires a combination of both appropriation and use in trade.'"). Plaintiff argues that "the Glendennings have wholly controlled use of the marks from the start—first as sole proprietors, then as sole directors of Rex Real Estate, Inc., and now as 49 percent owners each of the limited partnership (with the other 2 percent owned by the corporation)." But according to the evidence submitted by Plaintiff, Rex Glendenning first used the three marks in commerce between 1987 and 1990 as a sole proprietor. Under Texas law, a sole proprietorship is one and the same as the person who is the proprietor. *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 952 (Tex. 1983). Thus, Mr. Glendenning became the original owner of the marks when he first used them in commerce many years before Plaintiff was formed.

Plaintiff claims the Lanham Act permitted it to register the marks because "an applicant seeking to register a trademark may benefit from its use by a related company." 15 U.S.C. § 1055. A "related company" is defined as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." *Id.* § 1127. The term "person"

includes juristic persons and natural persons. *Id.* While the owner who registers the mark may benefit from the mark's use by related companies, this does not displace the requirement that only the owner can seek registration. *Id.* § 1051(a)(1).

Under the Lanham Act, assignments of marks that have already been federally registered must be in writing. *Id.* § 1060 ("Assignments shall be by instruments in writing duly executed."). Defendant relies on a Second Circuit case to argue that the assignment here must have been in writing, but that case is inapposite because it involved the transfer of a mark that was already federally registered. *SPI Spirits*, 726 F.3d at 67. On the other hand, Plaintiff argues that no assignment was needed because the marks were not previously federally registered. In support, it cites *Diebold* for the proposition that "[i]t is well settled that an assignment in writing is not necessary to pass rights in a trademark." *Diebold, Inc. v. Multra-Guard, Inc.*, 189 U.S.P.Q. 119, 1975 WL 20913, *6 (T.T.A.B. Oct. 2, 1975). However, the Trademark Trial and Appeal Board went on to say that "[t]he acquisition of such rights may be established by oral testimony and if such oral testimony is clear and uncontradictory testimony it may be accepted to prove the assignment." *Id.* While assignment by writing is not necessary to transfer ownership of a trademark under common law, an assignment is still necessary. *Id.*; 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:4 (5th ed. 2022) ("An assignment in writing is not necessary to pass common law rights in a trademark."). As our sister Circuit has explained, "[r]equiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ." *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997).

At trial, Plaintiff failed to produce any evidence that Mr. Glendenning assigned his rights in the marks to Plaintiff. In one exchange, Defendant's counsel asked Mrs. Glendenning, "There's never been a time when you and your husband transferred any individual rights you might have had to any trademark to the limited partnership, correct?" to which she responded, "I don't understand that question." After some clarification, Defendant's counsel asked the question again, and Mrs. Glendenning responded, "I apologize, but I truly do not understand the question. Rex and I own the trademarks and Rex Real Estate I is our limited partnership." There was no other testimony regarding the assignment of the marks at trial.

No reasonable jury could conclude that these statements amount to clear and uncontradictory testimony that Rex Glendenning assigned his rights in the marks to Plaintiff. Accordingly, we affirm the district court's judgment as a matter of law as to Plaintiff's Section 32(1) claim for any alleged infringement of the marks after they were federally registered. *Foreman*, 117 F.3d at 804 (Our affirmance can be upon grounds not relied upon by the district court). However, Defendant's ownership challenge does not apply to Plaintiff's claim under Section 43(a) for infringement of any marks before they were federally registered. We proceed to analyze the judgment as to that claim.

### b. Protectable Marks

For the first prong of its claim, Plaintiff must show that the marks are legally protectable. *Streamline*, 851 F.3d at 450. Plaintiff makes three arguments to that effect: (1) the crown logo is incontestable; (2) each of the three marks are inherently distinctive; and (3) each of the three marks have developed secondary meaning. Since we find a reasonable jury could conclude that the marks are inherently distinctive, we pretermit addressing the other two arguments.

No. 22-50405

Based on the evidence submitted, the district court concluded that no reasonable jury could find that the marks are anything other than personal name marks. Plaintiff claims this was error and that its three marks are at least suggestive because it presented evidence that the marks refer not merely to Rex Glendenning but also to the Latin translation of "rex" as "king."

Marks are classified along a spectrum in order of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Word marks that are suggestive, arbitrary, or fanciful are inherently distinctive. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11, (2000). A generic term refers to the class of which a good is a member. *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009). A descriptive term provides an attribute or quality of a good. *Id.* A suggestive term suggests, but does not describe, an attribute of the good; it requires the consumer to exercise his or her imagination to apply the trademark to the good. *Id.* This court prefers to "hav[e] a jury decide the issue of the categorization of a mark." *Streamline*, 851 F.3d at 453. Although judgment as a matter of law "is rarely appropriate" on the factual question of categorization, *Xtreme Lashes*, 576 F.3d at 232, we may affirm such a judgment where the record compels it. *Amazing Spaces*, 608 F.3d at 234.

Under the Lanham Act, a mark that is "primarily merely a surname" is not registrable in the absence of secondary meaning. 15 U.S.C. § 1052(e)(4). We also join our sister circuits in recognizing that "[f]or the purpose of trademark analysis, personal names—both surnames and first names—are generally regarded as descriptive terms which require proof of secondary meaning." *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir. 1988); *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990); *Tana v. Dantanna's*, 611 F.3d 767, 774 (11th Cir. 2010); *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760 (9th Cir. 2006). A mark

can still be inherently distinctive if the public perceives the mark to be something other than a personal name. 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 13:2 (5th ed. 2022) ("even if a mark actually consists of an actual personal name, secondary meaning will be required only if the public perceives the mark to be a personal name."). However, "the mere fact that a word has a dictionary definition does not exclude the possibility that it is primarily merely a surname." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 346 (2d Cir. 1999). The relevant question is whether the purchasing public perceives the mark as a whole as primarily referring to a personal name. *Id.*

In concluding that the marks are nothing more than personal name marks, the district court relied on Mr. Glendenning's affidavit that Plaintiff submitted to the USPTO when it sought to cancel Defendant's trademarks. In his declaration, he stated that "[a]mong consumers in the real estate industry, the name 'REX' has become synonymous with REX and Rex Glendenning as the exclusive source of the REX Real Estate Services, with Rex Glendenning as an individual being uniquely identified and recognized by consumers both in Texas and nationally as the founder of REX and REX Real Estate Services." At trial, Mr. Glendenning confirmed the statements made in his declaration. But Mr. Glendenning also stated, "I believe in my deposition, I also stated that we also named -- put the crown over Rex because of the Latin meaning of king and -- but yes I don't deny that my name's Rex and that it means king in Latin and we adopted it as -- the name of our company." At this point, Defendant's counsel had Mr. Glendenning turn to a page in his deposition where the following exchange occurred:

> Q. (BY MR. FLYNN) And I'll -- when you made the decision to adopt the name Rex Real Estate, why did you make that decision?

No. 22-50405

      A. Because I'm Rex, and I'm in the real estate business. And it's my mark and we think it's an excellent one and we decided to run with it the last three decades. The real Rex.

Defendant's counsel then asked, "When you made the decision to adopt the name Rex Real Estate, you did it because you're Rex and you are in the real estate business, correct?" to which Mr. Glendenning responded, "That's what it says." However, there was other evidence at trial supporting Plaintiff's claim that the public perceives the marks by their Latin meaning. For instance, Mrs. Glendenning testified that she "came up with the crown because Rex means king and that was that." Plaintiff's counsel also had Mr. Ryan, Defendant's CEO, read a portion of Defendant's response to an interrogatory where it said: "Defendant uses its mark Rex alone while plaintiff's mark is Rex Real Estate. Defendant's mark is most often accompanied by a crown, reinforcing the translation of Rex as a king in Latin." Ryan confirmed this statement and clarified that the reference to Defendant is a typo because Plaintiff's mark is most often accompanied by a crown.

      Plaintiff argues that the district court erred by relying on Mr. Glendenning's affidavit because it looked only to what the company intended for the mark, not how consumers perceive it. But Mr. Glendenning's declaration does not merely speak for himself or the company—he claimed that the name Rex has become synonymous with him as a person and founder of the company to consumers in the real estate industry. Plaintiff did not submit any evidence showing that the relevant consuming public associates the Rex marks with their purported Latin meaning. Nevertheless, it submitted evidence that Defendant views its marks by their Latin translation. While Defendant is not necessarily a member of the "purchasing public," the fact that some party outside of Plaintiff recognizes the Latin translation support its claims that the marks could be inherently distinctive. While there

was strong evidence that the marks are perceived by the public as primarily a personal name, the record does not compel that conclusion. *Amazing Spaces*, 608 F.3d at 234. The district court erred by deciding as a matter of law that Plaintiff's marks are not inherently distinctive.

### c. Likelihood of Confusion

The second prong—"likelihood of confusion"—requires Plaintiff to show that Defendants' use of the "Rex" marks "create[d] a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship." *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811-12 (5th Cir. 2019) (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)). To evaluate whether there is a likelihood of confusion, we use a non-exhaustive list of factors known as the "digits of confusion." *Xtreme Lashes*, 576 F.3d at 227. The digits are: "(1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *Id.* "No digit is dispositive, and the digits may weigh differently from case to case, 'depending on the particular facts and circumstances involved.'" *Id.* (citation omitted). "In addition to the digits of confusion, the particular context in which the mark appears must receive special emphasis." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485-86 (5th Cir. 2004). "While likelihood of confusion is typically a question of fact, summary judgment is proper if the 'record compels the conclusion that the movant is entitled to judgment as a matter of law.'" *Xtreme Lashes*, 576 F.3d at 227 (citation omitted); *see also Springboards*, 912 F.3d at 818 (affirming grant of summary judgment because "the great weight of the digits suggests there is no likelihood of confusion."); *Perry v. H. J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 473 (5th Cir. 2021) (affirming grant of summary judgment on likelihood of confusion). We address each digit in turn.

No. 22-50405

### i. The type of trademark.

"'Type of trademark' refers to the strength of the senior mark." *Xtreme Lashes*, 576 F.3d at 227. "We analyze two factors in determining the strength of a mark: (1) the mark's position along the distinctiveness spectrum, and (2) 'the standing of the mark in the marketplace.'" *Springboards*, 912 F.3d at 814 (citation omitted). The first factor refers to the five categories of increasing distinctiveness that marks generally fall into. *Xtreme Lashes*, 576 F.3d at 227. As discussed above, Plaintiff has presented sufficient evidence for a reasonable jury to conclude that the marks are at least suggestive.

The second factor is "the standing of the mark in the marketplace." *Springboards*, 912 F.3d at 814 (internal quotation marks and citation omitted). Here, the district court found that the marks had low standing because many other entities in Texas have "Rex" names, and some of those businesses are involved in real estate. Plaintiff challenges the district court's reliance on third-party usage in other industries, but "[a]ll third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 479 (5th Cir. 2008). Still, third-party usage is especially relevant when it falls within the same industry or category of services. *Springboards*, 912 F.3d at 815 (numerous third-party literacy programs using language similar or nearly identical to plaintiff's marks "suggests that consumers will not associate the junior mark's use with the senior mark user"); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) (A significant number of other Florida financial institutions using "Sun" in their names lessened the standing of the mark). "[T]he key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Smack Apparel*, 550 F.3d at 479.

No. 22-50405

Defendant claims there are hundreds of entities using "Rex" in their business name, including in real estate. It follows this assertion with ranges of citations to over 1000 pages in the record on appeal, and it does not specify which pages in these ranges show other "Rex" entities involved in Texas real estate. We have noted that "it is not the function of the Court of Appeals to comb the record for possible error, but rather it is counsel's responsibility to point out distinctly and specifically the precise matters complained of, with appropriate citations to the page or pages in the record where the matters appear." *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989). The same goes for the Appellee—we will not go on a fishing expedition in search of evidence to support Defendant's argument. While there are many other entities named "Rex" in Texas, Defendant has not satisfactorily pointed us to evidence of other Texas businesses using the term "Rex" in real estate. Furthermore, the jury saw proof that only Plaintiff and Defendant appear in the first page of results in a Google search for "Rex Real Estate Texas." Plaintiff also asserts that the numerous calls it received from confused consumers who heard Defendant's advertisements shows that the marks have strong standing in the marketplace because it could mean that the callers assumed that Plaintiff was the sole source of the advertising. This is a plausible inference for a jury to make. Taken together and in the light most favorable to the Plaintiff, a reasonable jury could find that this factor weighs in favor of Plaintiff.

### ii. Mark similarity.

The degree of similarity between marks "is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.*, 141 F.3d at 201. "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features," but "courts should give more attention to the dominant features of a mark."

No. 22-50405

*Xtreme Lashes*, 576 F.3d at 228 (internal quotation marks and citations omitted).

The district court concluded that the crown logo and one of Defendant's logos are visually distinct because they use different fonts, colors, and design elements. However, these two logos contain the same words, "Rex Real Estate," in a similar configuration. Plaintiff also submitted evidence that Defendant has advertised itself as "Rex Real Estate" and "Rex." A reasonable jury could find these marks similar enough to confuse their origin. *Xtreme Lashes*, 576 F.3d at 228.

### iii & iv. Product similarity and identity of purchasers.

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). Likewise, "[d]issimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendants' goods lessen the possibility of confusion, mistake, or deception." *Id.* (quotation marks and citation omitted). "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Elvis Presley Enters.*, 141 F.3d at 202. "The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand . . . The actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand . . . Consumer perception is the controlling factor." *Id.* "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id.* (citation omitted).

No. 22-50405

Plaintiff argues that it and Defendant offer similar services because both offer "real estate brokerage services," both "firms have brokered deals for various types of properties," and "both regard the same companies as their direct competitors."

As discussed above, Plaintiff presented at most nine recorded instances where it was involved in the sale of single-family homes to individual buyers between 2009 and 2022. However, Plaintiff closes thousands of real estate deals, including almost four-hundred deals in 2015 alone. Even the vast majority of its "residential" listings were sold to corporate entities. On the other hand, Defendant exclusively focuses on selling single family homes to homebuyers who are seeking a home to live in. Clearly, Plaintiff and Defendant operate in different corners of the real estate market and cater to different sets of prospective customers. While Plaintiff and Defendant may both regard Sotheby's, Coldwell Banker, and Redfin as competitors, Plaintiff's expert testified that these companies sell both residential and commercial real estate. Thus, Plaintiff primarily competes with their commercial listings while Defendant primarily competes with their residential listings, and this does not support Plaintiff's argument that both companies provide the same services.

Plaintiff rarely brokers single-family homes, and there is no indication that it intends to expand into this market. But its actual intent to expand into this market is not particularly probative. *Elvis Presley Enters.*, 141 F.3d at 202. The question is whether the consuming public would believe that the natural tendency of brokers involved in commercial and investment real estate is to expand into the brokerage of single-family homes. *Id.* While this progression strikes us as unlikely, we cannot say that no reasonable jury could reach this conclusion with regard to the consuming public since Plaintiff and Defendant are both involved in brokering real estate. A reasonable jury could weigh this digit in Plaintiff's favor.

### v. Advertising media identity.

For this factor, we look to the "similarity between the parties' advertising campaigns. The greater the similarity in the campaigns, the greater the likelihood of confusion." *Exxon*, 628 F.2d at 506.

Plaintiff's and Defendant's divergent advertising identities reflect their divergent business practices. Plaintiff spends 86% of its annual advertising budget on leasing its corporate suite at AT&T Stadium for entertaining clients. It also hosts an annual dove hunt for both existing and prospective clients. Matthew Kiran, Plaintiff's long-time sales agent, testified that Plaintiff focuses its business on face-to-face interactions: "you'll hear a lot of stuff about high tech and algorithms and matching this and that. We're high touch. We want to do business face-to-face, people-to-people. That's what we do. And so, our business is different from the internet computer thing." Mr. Glendenning testified that Plaintiff does not use digital marketing. By contrast, Mr. Ryan testified that Defendant's business model is "direct to consumer with internet . . . we're very much a digital relationship." Accordingly, Defendant focuses on targeting potential consumers with online advertisements. While both companies use signage, print advertisements, and radio spots to a limited extent, the lions' share of Plaintiff's advertising expenses go to entertaining its clients in person while the lions' share of Defendant's advertising expenses go to targeting potential customers online. No reasonable jury could find that this factor weighs in Plaintiff's favor.

### vi. Defendant's intent.

The district court found no evidence that Defendant intentionally used the Rex mark because of Plaintiff's business. Plaintiff does not challenge this finding, but it does challenge the district court's conclusion that this factor weighs against it. Plaintiff is correct. "If there is no evidence of intent

No. 22-50405

to confuse, then this factor is neutral." *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 195 (5th Cir. 2018). This factor does not weigh in favor of either party.

### vii. Actual confusion.

"Actual confusion need not be proven," but it is "the best evidence of a likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229. "A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both." *Streamline*, 851 F.3d at 457 (citation omitted). A plaintiff alleging infringement must show that the defendant's use of marks, "as opposed to some other source, caused a likelihood of confusion." *Scott Fetzer*, 381 F.3d at 487.

In this appeal, Plaintiff relies only on anecdotal instances of confusion. Plaintiff presents instances of people who inadvertently contacted one party while looking to do business with or contact the other. It also presents evidence of people confused about whether Plaintiff is affiliated with Defendant. Relying principally on our decision in *Elvis Presley Enterprises*, it argues that these instances are sufficient to show actual confusion even if they did not result in swayed customer purchases. *See* 141 F.3d at 204. In turn, Defendant relies principally on our decision in *Streamline Production Systems* to argue that Plaintiff's anecdotes show nothing more than a "fleeting mix-up of names" and that proof of swayed customer purchases is required. *See* 851 F.3d at 457. Since there has been some confusion over what kind of actual confusion counts,[3] we now take a closer a look at our precedent in this area.

---

[3] *See, e.g., Savage Tavern, Inc. v. Signature Stag, L.L.C.*, 589 F. Supp. 3d 624, 655 (N.D. Tex. 2022) ("the Fifth Circuit's caselaw is muddled as to whether a sale is required for proof of actual confusion.")

No. 22-50405

More recently, this court has held that plaintiffs must show instances of confusion resulting in swayed customer purchases. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 297 (5th Cir. 2020) (plaintiff failed to show actual confusion because it "provide[d] no evidence that that confusion 'swayed consumer purchases.'"); *Streamline*, 851 F.3d at 457 (evidence of actual confusion "must show that '[t]he confusion was caused by the trademarks employed and it swayed consumer purchases.'"). However, this requirement conflicts with some of our earlier cases. For instance, in *World Carpets*, the plaintiff was a wholesale distributor of carpets who sued a group of Texas carpet retailers. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 484 (5th Cir. 1971). While plaintiff "found it economically advantageous to refrain from participating in any retail activity in order to retain the good will of its independent retail customers," the defendant's use of a similar mark led plaintiff's own retailers to complain to plaintiff because they believed it had entered the retail market. *Id.* Considering evidence that the plaintiff's customers were confused as to whether plaintiff had entered the retail market, we affirmed the district court's directed verdict on a likelihood of confusion. *Id.* at 489. While there was evidence that its own customers were confused as to the defendant's affiliation with plaintiff, there was no proof that this confusion swayed customer purchases. Further, proof of confusion on the part of ultimate purchasers is not required. *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985) ("the trial court appears to have believed that only actual confusion on the part of ultimate purchasers was relevant, and for this reason to have discounted the evidence (and its own findings) of actual confusion on the part of distributors and trade show visitors. This was error as well."). In *Elvis Presley Enterprises*, we explicitly noted that "[i]nfringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result

of the confusion." 141 F.3d at 204. Accordingly, to the extent our more recent cases require proof of swayed customer purchases, our prior holdings control. *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect.").

Still, we must determine what weight to assign to the instances that Plaintiff has submitted. Plaintiff relies on *Xtreme Lashes* for the proposition that "very little proof of actual confusion [is] necessary to prove the likelihood of confusion." 576 F.3d at 229. It also cites *Streamline* where we explained that likelihood of confusion "can be supported by testimony of a single known incident of actual confusion." 851 F.3d at 457 (citing *La. World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)). However, the plaintiff in *Louisiana World Exposition* submitted testimony from a customer who purchased one of defendant's tee shirts thinking it was made by plaintiff. *Id.* And *Xtreme Lashes* involved two instances where potential customers of plaintiff were confused into buying products from defendant. *Xtreme Lashes*, 576 F.3d at 230. Thus, very little proof is required when customer purchases were actually swayed. However, as discussed below, more is required when the confusion did not or cannot sway purchases.

In *Domino's Pizza*, we reversed the district court's holding that there was a likelihood of confusion between plaintiff's "Domino" mark and defendant's "Domino's Pizza" mark. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 255 (5th Cir. 1980). In that case, the plaintiff presented evidence that two people had inquired about whether defendant was related to plaintiff. "In view of the fact that both plaintiff's and defendants' sales currently run into the millions of dollars each year, these isolated instances of actual confusion are insufficient to sustain a finding of likelihood of confusion." *Id.* at 263. Thus, isolated instances of confusion about the affiliation of two companies that do not result in redirected business are not

enough to sustain a finding of actual confusion. Additionally, proof of actual confusion not involving swayed customer purchases should be weighed against the parties' total volume of sales.

In *Sun Banks*, we reversed a district court's finding of a likelihood of confusion between the marks of plaintiff, Sun Banks of Florida, and defendant, Sun Federal Savings and Loan Association. *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 313 (5th Cir. 1981). For evidence of actual confusion, the plaintiff's president requested that employees report incidents of confusion stemming from the defendant's use of the word "Sun" in its name. *Id.* at 319. Less than fifteen incidents were reported over a three-year period, and none were contacts by "a potential customer considering whether to transact business with one or the other of the parties." *Id.* The plaintiff also produced four witnesses who had inquired whether the two companies were related, but "in each instance there is no indication that the inquiry was made by a potential customer concerning the transaction of business." *Id.* "Although the record contains several isolated instances of uncertainty whether there was a connection between the two businesses, in light of the number of transactions conducted and the extent of the parties' advertising, the amount of past confusion is negligible." *Id.* In addition to reaffirming that instances of uncertainty about affiliation or connection can be weighed against each company's volume of business as a whole, *Sun Banks* instructs that we also look to the volume of each company's advertising. Additionally, actual confusion has more weight if it is a potential customer considering whether to transact business with one or the other.

In *Armco*, we affirmed the trial court's finding of a likelihood of confusion. *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1156 (5th Cir. 1982). In that case, plaintiff provided evidence that one of its employees received phone calls once a month from people trying to reach defendant, and two other employees who had received one phone call each from people

trying to reach the defendant. *Id.* at 1160. There, we distinguished *Domino's Pizza* and *Sun Banks* because the evidence of actual confusion was "thin" in those cases. *Id.* Citing an Eleventh Circuit case analyzing Fifth Circuit case law, we explained that our "precedents give varying weight to evidence of actual confusion, depending on whether it is short-lived confusion by individuals casually acquainted with a business or lasting confusion by actual customers." *Id.* at n.11 (citing *Safeway Stores, Inc. v. Safeway Discount Drugs*, 675 F.2d 1160, 1166–1167 (11th Cir. 1982)). The two companies provided different products to different customers, so there was no possibility that the misdirected phone calls could divert sales away from the plaintiff. Nevertheless, we credited this evidence in affirming the lower court's finding of likelihood of confusion on clear error review. *Id.* at 1160.

In *Elvis Presley Enterprises,* we held that "[i]nfringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998) (citing 3 J. Thomas McCarthy, McCarthy On Trademarks and Unfair Competition § 23:6 (4th ed. 1997)). Initial confusion, even if it is "later dissipated by further inspection of the goods, services, or premises . . . is relevant to a determination of a likelihood of confusion." *Id.* (citations omitted). Such confusion "gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated." *Id.* In that case, Elvis Presley Enterprises ("EPE"), the assignee and registrant of all trademarks, copyrights, and publicity rights belonging to the Elvis Presley estate, sued the owner of a Houston bar called "the Velvet Elvis." *Id.* at 191. EPE presented the testimony of various witnesses who "initially thought the Defendants' bar was a place that was associated with Elvis Presley and that it might have Elvis merchandise for sale." *Id.* at 204. After entering, each witness had no

doubt the bar was not affiliated with Elvis in any way. *Id.* Concluding that this kind of initial interest confusion was still relevant, we observed the following:

> Despite the confusion being dissipated, this initial-interest confusion is beneficial to the Defendants because it brings patrons in the door; indeed, it brought at least one of EPE's witnesses into the bar. Once in the door, the confusion has succeeded because some patrons may stay, despite realizing that the bar has no relationship with EPE. This initial-interest confusion is even more significant because the Defendants' bar sometimes charges a cover charge for entry, which allows the Defendants to benefit from initial-interest confusion before it can be dissipated by entry into the bar.

*Id.* at 204. Unlike *Sun Banks*, these instances involved potential customers of plaintiff because they were interested in official Elvis merchandise, but they walked in defendant's door because they were confused as to affiliation.

With these decisions to guide our analysis, we turn to the evidence in this case. Plaintiff points to two instances of people who inadvertently contacted Defendant while looking to do business with or contact Plaintiff. On September 13, 2018, one person sent Defendant a chat message on their website stating, "I need REX Glendenning email or phone number." Defendant's chat agent responded, "We currently don't have anyone with that name at this company." On June 14, 2019, another person sent a chat message inquiring about a property stating, "You have your signs up in Prosper and areas around there for large parcels of land," but the chat agent responded, "Sorry, we do not sell land and we are not in the Dallas area." In both of those cases, people intending to contact Plaintiff inadvertently contacted Defendant. In each case, the person inquiring clearly intended to contact or transact business with Plaintiff. Thus, unlike the initial interest confusion in *Elvis Presley*, this confusion did not present the possibility of garnering the Defendant business before or after it was dissipated.

Plaintiff next points to three instances where it received phone calls from people who had seen or heard Defendant's advertisements. It also presents one instance where a customer of Defendant sent a letter to Plaintiff complaining about Defendant's services. The district court disregarded these instances because none involved people who were seeking to do business with Plaintiff. However, under *Armco*, proof that the plaintiff is receiving calls from people who are trying to do business with the other party can still be relevant even where there is no realistic possibility that business can be diverted. 693 F.2d at 1160. Finally, Plaintiff presents two instances of third parties confusing the companies or their locations. As we have explained, those anecdotes are relevant because proof of actual confusion is not limited to actual or potential customers. *Fuji*, 754 F.2d at 597.

Plaintiff's anecdotal proof of confusion does not involve swayed customer purchases or initial interest confusion that can result in swayed business. It also does not involve "potential customer[s] considering whether to transact business with one or the other of the parties." *Sun Banks*, 651 F.2d at 319. But it has presented instances of potential customers of each respective company mistakenly contacting the other. *Armco*, 693 F.2d at 1160. These instances are relevant, but their weight is lessened by Plaintiff's and Defendant's high volume of business and extensive advertising. *Sun Banks*, 651 F.2d at 319. Nevertheless, because Plaintiff has presented some relevant evidence of actual confusion, a reasonable jury could conclude that this digit weighs in its favor.

### viii. Degree of care exercised by potential purchasers.

For the final digit, we determine the degree of care by looking to both the kind of goods or services offered and the kind of purchasers. "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion . . . However, a high price tag

alone does not negate other [digits of confusion], especially if the goods or marks are similar." *Streamline*, 851 F.3d at 458 (internal quotation marks and citations omitted). "[P]rofessional and institutional" purchasers "are virtually certain to be informed, deliberative buyers." *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986).

Plaintiff relies on the Trademark Trial and Appeal Board's conclusion that "average homeowners do not use a high degree of care in selecting their broker." *Real Est. One, Inc. v. Real Est. 100 Enterprises Corp.*, 212 U.S.P.Q. 957, 1981 WL 40478, at *3 (T.T.A.B. 1981). That case involved two real estate brokerage companies that were "primarily directed to residential listings and sales." *Id.* Even if Defendant's customers do not use a high degree of care in selecting their broker for single-family homes, Plaintiff's customers are not average homebuyers or homeowners—they are by and large corporate entities and wealthy individuals investing in commercial and residential real estate. Such customers are "virtually certain to be informed, deliberative buyers." *Oreck*, 803 F.2d at 173; *accord Int'l Council of Shopping Centers, Inc. v. RECONCRE, L.L.C.*, 2021 WL 148387, at *5 (D.D.C. Jan. 14, 2021) ("it is hard to deny that commercial real estate market participants are, by and large, sophisticated consumers."). Plaintiff's potential customers exercise a high degree of care, so no reasonable jury could find that this digit weighs in favor of Plaintiff.

### ix. Weighing the Digits

Since a reasonable jury could conclude that some of these factors, including the important factor of actual confusion, weigh in Plaintiff's favor, a reasonable jury could also find a "probability of confusion" between Plaintiff and Defendant's marks. *Xtreme Lashes*, 576 F.3d at 226. The district court erred by holding that Plaintiff could not establish a likelihood of confusion as a matter of law.

No. 22-50405

### d. Damages

Plaintiff also challenges the district court's holding on damages for corrective advertising and reasonable royalties. Since we remand for a new trial, we need not address those issues.

## IV. Conclusion

No reasonable jury could conclude that Plaintiff owned the marks, so we affirm the district court's judgment as a matter of law as to Plaintiff's Section 32(1) claim for alleged infringement of the marks after federal registration. However, taking the evidence in the light most favorable to Plaintiff and "leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury," a reasonable jury could find in favor of Plaintiff's claim under Section 43(a) for infringement of the marks before they were federally registered. We AFFIRM in part, REVERSE in part, and REMAND for further proceedings.